UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CONSORTIUM FOR INDEPENDENT
JOURNALISM, INC.,

                         Plaintiff,

                -v.-

THE UNITED STATES OF AMERICA and
NEWSGUARD TECHNOLOGIES, INC.,

                         Defendants.

23 Civ. 7088 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

    Before the Court are two motions to dismiss claims of First Amendment violations and defamation that were brought by the Consortium for Independent Journalism, Inc. ("*Consortium News*" or "Plaintiff") against the United States of America (the "Government") and NewsGuard Technologies, Inc. ("NewsGuard") (collectively, "Defendants"). NewsGuard, the lesser-known of the two defendants, is a private company that rates the trustworthiness of online news sources. Plaintiff alleges that the Government and NewsGuard jointly violated Plaintiff's First Amendment rights by virtue of a contract between the two, pursuant to which NewsGuard identified instances of foreign propaganda in online news sources, specifically, Plaintiff's articles concerning matters related to Russia and Ukraine. Plaintiff also brings a claim of defamation against NewsGuard based on its labeling of the *Consortium News* website.

    To be sure, this litigation raises several hot-button issues regarding the metes and bounds of the First Amendment, state action, and defamation. But

however provocative they may appear at first glance, these issues fall comfortably within settled law, and for the reasons that follow, the Court dismisses Plaintiff's Second Amended Complaint with prejudice.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    NewsGuard's Labeling of Online News Sources

NewsGuard is a private, New York-based for-profit company that rates the trustworthiness of online news sources.  (SAC ¶ 31).  It has approximately 40,000 subscribers who pay approximately $4.95 monthly to receive these ratings.  (*Id.*).  Its subscribers include several institutional and governmental clients, such as libraries and universities.  (*Id.*).  Among other services, NewsGuard provides detailed "Nutrition Labels" that rate the trustworthiness, reliability, and ethics of online news organizations based on nine criteria that yield a "trust" scale of zero to one hundred points.  (*Id.* ¶ 32).  When

---

[1]    This Opinion draws its facts from the Second Amended Complaint (the "SAC" (Dkt. #36)), and the exhibits attached thereto ("SAC, Ex. [ ]"), the well-pleaded allegations of which are taken as true for purposes of this Opinion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009).  The exhibits referenced in the SAC appear at docket entries 3 (Exhibits A-I) and 5 (Exhibits J-Q).  The Court also relies, as appropriate, on certain of the exhibits attached to the Declarations of Theodore J. Boutrous, Jr. ("Boutrous Decl., Ex. [ ]" (Dkt. #42)).  *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

For ease of reference, the Court refers to NewsGuard's brief in support of its motion to dismiss the SAC as "NG Br." (Dkt. #41); the Government's brief in support of its motion to dismiss the SAC as "Gov't Br." (Dkt. #45); the declaration of Jonathan P. Bettin in support of the Government's motion to dismiss the SAC as "Bettin Decl." (Dkt. #46); Plaintiff's brief in opposition to the Government's motion to dismiss as "Pl. Gov't Opp." (Dkt. #51); Plaintiff's brief in opposition to NewsGuard's motion to dismiss as "Pl. NG Opp." (Dkt. #52); NewsGuard's reply brief as "NG Reply" (Dkt. #65); the Government's reply brief as "Gov't Reply" (Dkt. #66); Plaintiff's supplemental letter brief as "Pl. Supp. Br." (Dkt. #69); NewsGuard's supplemental letter brief as "NG Supp. Br." (Dkt. #71); and the Government's supplemental letter brief as "Gov't Supp. Br." (Dkt. #72).

NewsGuard rates a news organization, its subscribers can see displayed on their search engine result a "flag or shield that opens to a warning that viewers or readers should '[p]roceed with caution' because [the] news site [i] fails to meet journalistic standards, [ii] fails to make corrections of false facts[,] [or] [iii] purveys false information, among other references." (*Id.* ¶ 34). These labels are "attached to the heading of *any article* on a NewsGuard subscriber's screen for any search reporting a result from" a news organization rated by NewsGuard. (*Id.* ¶ 35 (emphasis added)). When users hover over the flag or shield, a box including more detail about NewsGuard's rating pops up, including the news organization's "trust" score and a link to the full Nutrition Label for that organization, containing a detailed explanation for the rating. (*Id.* ¶¶ 50-51; *see also id.*, Ex. A, N).

Plaintiff alleges that NewsGuard carries out its rating process by first reaching out to news organizations through a reporter, who explains that NewsGuard is reviewing the organization for its publication of false content and "demand[s]" corrections of material that NewsGuard deems false. (SAC ¶ 41). If the news organization "does not agree to withdraw or correct the material," NewsGuard publishes its warning. (*Id.*). According to Plaintiff, these actions are "designed and intended to force targeted news organizations into withdrawing legitimate news and commentary." (*Id.* ¶ 46).

### 2. The "Misinformation Fingerprints" Contract Between the Government and NewsGuard

In September 2021, the U.S. Air Force's (the "USAF") USAF Research Lab – AFWERX, on behalf of U.S. Cyber Command, awarded NewsGuard a

"Misinformation Fingerprints" contract in the amount of $749,387, starting on September 7, 2021, and ending on December 8, 2022. (SAC ¶¶ 19, 138; *see generally* Bettin Decl.). This contract allowed U.S. Cyber Command to access NewsGuard's "Misinformation Fingerprints solution," described more fully in this section. (Bettin Decl. ¶ 4). NewsGuard delivered the final deliverable under the Misinformation Fingerprints contract on April 16, 2023, and the USAF made its final payment on May 31, 2023. (*Id.* ¶ 5). The Government has not entered into additional contracts with NewsGuard since the Misinformation Fingerprints contract ended. (*Id.* ¶¶ 5-6).

According to Plaintiff, under the Misinformation Fingerprints contract, NewsGuard "is paid to identify media organizations that provide information or reportage concerning Ukraine and Russia that dissent from or are contrary to the political and diplomatic positions or viewpoints of the U.S."; more to the present litigation, Plaintiff alleges that NewsGuard's labeling of *Consortium News* "is performed as a part of [the Misinformation Fingerprints] contract." (SAC ¶ 20). On its website, NewsGuard describes the "Misinformation Fingerprints" program as a "catalogue[ ]" of "false narratives" by "Russia's propaganda outlets" that Russia has used to "create[ ] pretexts or justifications for war" in Ukraine. (*Id.* ¶ 144 (quoting *id.*, Ex. Q)). According to NewsGuard, this "Misinformation Fingerprints" program focuses on, among others, "three key narratives leading Russia's Ukraine propaganda effort," namely that (i) "[t]he West staged a coup to overthrow the Ukrainian government," (ii) "Ukrainian politics and society is dominated by Nazi ideology," and

(iii) "[e]thnic Russians in [the] Donbas [region of Ukraine] have been subjected to genocide." (*Id.* (quoting *id.*, Ex. Q)).

In a March 10, 2023 email, NewsGuard co-founder Gordon Crovitz advised a reporter that part of NewsGuard's work for the Government "is focused on the identification and analysis of information operations targeting the [U.S.] and its allies conducted by hostile governments, including Russia and China." (SAC ¶ 22; *see also id.*, Ex. K at 1). Crovitz further explained that NewsGuard "oppose[s] *any* government involvement in rating news sources," which is why their "work rating news sources and identifying false narratives being spread by foreign governments is entirely independent and free of any outside influence, including from the U.S. or any other government." (*Id.*, Ex. K at 1 (emphasis added)).

### 3.    NewsGuard's Labeling of Plaintiff's Website

The claims at issue in the Second Amended Complaint arise from NewsGuard's rating and labeling of Plaintiff's website. *Consortium News* is an "internet-based news, commentary[,] and analysis provider" that was founded in 1995 and that is, by its own account, "dedicated to producing independent content ... frequently challenging U.S. governmental or foreign policy." (SAC ¶¶ 6-7). Its editor-in-chief is veteran journalist Joe Lauria. (*Id.* ¶ 13). At one time, the late Daniel Ellsberg, the Pentagon Papers leaker, sat on its board. (*Id.* ¶ 15). It is fair to say that *Consortium News* offers a left-wing take on the news with an independent — and somewhat contrarian — streak.

Beginning on or about August 11, 2022, NewsGuard began attaching warning flags to *Consortium News* articles.  (SAC ¶¶ 48-49).  When NewsGuard subscribers hover over these flags, they see an overlaying "Nutrition Label" that warns users: "Proceed with caution: This website fails to adhere to several basic journalistic standards."  (*Id.* ¶¶ 50-52 (citing *id.*, Ex. A)).  The Nutrition Label describes *Consortium News* as "[a] website that covers international politics from a left-wing, anti-U.S. perspective that has published false claims about the Ukraine-Russia war and other international conflicts."  (*Id.* ¶ 51 (quoting *id.*, Ex. A)).  It says that Plaintiff "repeatedly publish[es] false content," does not "[g]ather[ ] and present[ ] information responsibly," and does not "[r]egularly correct[ ] or clarif[y] errors."  (*Id.*, Ex. N at 1).  This label attaches to every *Consortium News* article that appears in a subscriber's search engine result, though NewsGuard has only specifically disputed the content of six articles.  (*Id.* ¶¶ 56-58).

NewsGuard claims that Plaintiff published false content regarding a 2014 "coup" organized by the U.S. in Ukraine; the prevalence of neo-Nazis in Ukraine; and a genocide committed against ethnic Russians in Ukraine's Donbas region — which, as it happens, are three of the key narrative "myths" that are the subject of the Misinformation Fingerprints program.  (SAC ¶ 146; *see id.*, Ex. N).  In a March 2022 email exchange between NewsGuard reporter Zachary Fishman and *Consortium News* editor-in-chief Joe Lauria, Fishman took issue with six *Consortium News* articles that NewsGuard considers to contain "false content."  (*Id.*, Ex. C at 1-4).  In the Second Amended Complaint,

Plaintiff attempts to rebut NewsGuard's assertion that these articles contain false content.  (*Id.* ¶¶ 74-135(a)).

## B.    Procedural Background

Plaintiff filed the initial complaint in this action on August 11, 2023. (Dkt. #3).  Before effecting service, Plaintiff filed an amended complaint (the "First Amended Complaint" or "FAC") on October 23, 2023.  (Dkt. #5).  On January 2, 2024, NewsGuard filed a letter motion seeking leave to file a motion to dismiss the FAC.  (Dkt. #18).  After the Court adjourned the initial pretrial conference *sine die* and allowed the Government additional time to respond to the FAC (*see* Dkt. #20), the Government filed a pre-motion letter also seeking leave to file a motion to dismiss the FAC on February 2, 2024 (Dkt. #22). Plaintiff filed a letter in opposition on February 12, 2024.  (Dkt. #25).  On February 15, 2024, the Court set a pre-motion conference for March 8, 2024. (Dkt. #27).

The Court held a pre-motion conference on March 8, 2024, during which the Court discussed with the parties the issues raised in their pre-motion letters.  (*See* March 8, 2024 Minute Entry; Dkt. #57 (transcript)).  Following the conference, on April 4, 2024, Plaintiff indicated its intent to file a Second Amended Complaint (or "SAC").  (Dkt. #32).  Ultimately, Plaintiff filed the SAC on April 12, 2024.  (Dkt. #36).  The SAC contains two claims.  Broadly speaking, NewsGuard's Misinformation Fingerprints contract with the Government forms the basis of Plaintiff's claim that *both* Defendants coerced Plaintiff in violation of its First Amendment rights.  (SAC ¶¶ 136-157(a)

(Count I)).  By contrast, NewsGuard's statements that Plaintiff publishes false content and does not adhere to journalistic standards form the basis of Plaintiff's defamation claim against NewsGuard alone.  (*Id.* ¶¶ 158-182(a) (Count II)).

Thereafter, on April 23, 2024, the Court adopted the parties' proposed briefing schedule for two motions to dismiss the SAC, one from each defendant. (Dkt. #38).  On June 11, 2024, NewsGuard filed its motion to dismiss the SAC and memorandum of law in support thereof.  (*See* Dkt. #40-42).  After the Court granted an extension request (Dkt. #43), the Government filed its motion to dismiss the SAC and memorandum of law in support thereof on June 17, 2024 (*see* Dkt. #44-46).  After the Court granted Plaintiff's two extension requests (*see* Dkt. #47-50), on September 10, 2024, Plaintiff filed its brief in opposition to the Government's motion to dismiss (Dkt. #51) and its brief in opposition to NewsGuard's motion to dismiss (Dkt. #52).  On October 23, 2024, NewsGuard filed its reply brief (Dkt. #65), and the Government filed its reply brief (Dkt. #66).

On February 19, 2025, Plaintiff submitted a supplemental letter brief regarding a recent executive order issued by President Donald J. Trump.  (Dkt. #69).  After the Court ordered Defendants to respond (Dkt. #70), NewsGuard filed its letter in response on March 6, 2025 (Dkt. #71), and the Government filed its letter in response on the same date (Dkt. #72).

## DISCUSSION

### A.   Legal Standards

#### 1.   Federal Rule of Civil Procedure 12(b)(1)

##### a.   Sovereign Immunity

"[T]he United States, as sovereign, is immune from suit save as it consents to be sued ... , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *Makarova* v. *United States*, 201 F.3d 110, 113 (2d Cir. 2000) (omission in original) (quoting *United States* v. *Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States* v. *Sherwood*, 312 U.S. 584, 586 (1941) (internal citations omitted))); *accord Cnty. of Suffolk, N.Y.* v. *Sebelius*, 605 F.3d 135, 140 (2d Cir. 2010). "The doctrine of sovereign immunity is jurisdictional in nature, and therefore to prevail, the plaintiff bears the burden of establishing that her claims fall within an applicable waiver." *Makarova*, 201 F.3d at 113 (internal citation omitted); *accord Vidurek* v. *Koskinen,* 789 F. App'x 889, 892 (2d Cir. 2019) (summary order).

##### b.   Standing

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC* v. *Ramirez*, 594 U.S. 413, 423 (2021). To "demonstrate [his] personal stake" and establish standing to bring suit, a plaintiff "must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would like be redressed by judicial relief." *Id.* (citing *Lujan* v. *Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Article III standing "is a 'jurisdictional' requirement and 'must be assessed before reaching the merits.'" *Calcano* v. *Swarovski N. Am. Ltd.*, 36 F.4th 68, 74 (2d Cir. 2022) (quoting *Byrd* v. *United States*, 584 U.S. 395, 410-11 (2018)).  As such, Rule 12(b)(1) is the appropriate vehicle for an argument that the plaintiff lacks standing.  *See Lyons* v. *Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (quoting *Makarova*, 201 F.3d at 113).

### 2.    Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-79 (2009).  A plaintiff is entitled to relief if she alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge[ ] [the plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 570)).

That said, a court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted); *see also*

*Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal quotation marks omitted and alteration adopted) (quoting *Iqbal*, 556 U.S. at 678)). Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).

On a motion to dismiss, "[t]he Court may consider any written instrument attached to the [c]omplaint as an exhibit, any statements or documents incorporated by reference in the [c]omplaint, documents that are 'integral' to the [c]omplaint even if they are not incorporated by reference, and matters of which judicial notice may be taken." *Donoghue* v. *Gad*, No. 21 Civ. 7182 (KPF), 2022 WL 3156181, at *2 (S.D.N.Y. Aug. 8, 2022) (citing *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016)).

## B. Plaintiff's First Amendment Claim

### 1. The Court Dismisses Plaintiff's First Amendment Claim Against NewsGuard Under Rule 12(b)(6) for Failing to Allege State Action

"'Because the United States Constitution regulates only the Government, not private parties,' a litigant … who alleges that [its] 'constitutional rights have been violated must first establish that the challenged conduct constitutes

"state action.""" *Grogan* v. *Blooming Grove Volunteer Ambulance Corps*, 768

F.3d 259, 263 (2d Cir. 2014) (quoting *Flagg* v. *Yonkers Sav. & Loan Ass'n, FA*,

396 F.3d 178, 186 (2d Cir. 2005) (internal quotation marks omitted)).  A

plaintiff can show state action by alleging that

> [i] the [Government] compelled the conduct [the 'compulsion test'], [ii] there is a sufficiently close nexus between the [Government] and the private conduct [the 'close nexus test' or 'joint action test'], or [iii] the private conduct consisted of activity that has traditionally been the exclusive prerogative of the [Government] [the 'public function test'].

*McGugan* v. *Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014) (quoting *Hogan*

v. *A.O. Fox Memorial Hosp.*, 346 F. App'x 627, 629 (2d Cir. 2009) (summary

order)); *accord Manhattan Comm. Access Corp.* v. *Halleck*, 587 U.S. 802, 809

(2019).  "The fundamental question under each test is whether the private

entity's challenged actions are 'fairly attributable' to the state." *McGugan*, 752

F.3d at 229 (quoting *Fabrikant* v. *French*, 691 F.3d 193, 207 (2d Cir. 2012)

(quoting *Rendell-Baker* v. *Kohn*, 457 U.S. 830, 838 (1982))).  Courts routinely

decide whether a plaintiff has sufficiently alleged state action as a matter of law

at the Rule 12(b)(6) stage.  *See, e.g.*, *Alterescu* v. *N.Y.C. Dep't of Educ.*, No. 21

Civ. 925 (KPF), 2022 WL 3646050, at *6 (S.D.N.Y. Aug. 23, 2022); *Cain* v.

*Christine Valmy Int'l Sch. of Esthetics, Skin Care, & Makeup*, 216 F. Supp. 3d

328, 332-34 (S.D.N.Y. 2016).

  With respect to its First Amendment claim against NewsGuard, Plaintiff

has not shown that NewsGuard's conduct amounts to state action.

Specifically, Plaintiff fails to allege sufficiently that NewsGuard (i) performs a

traditional public function, or (ii) acted jointly with the Government such that NewsGuard's conduct amounts to state action.

"First, even under a liberal reading of the [Second Amended Complaint], Plaintiff has not pleaded any facts tending to show that [it] was compelled or controlled by the state, and thus fails to allege that [NewsGuard] [is a] state actor[ ] under the 'compulsion test.'" *Cain*, 216 F. Supp. 3d at 333. Indeed, Plaintiff raises arguments under the public function and joint action tests, but not the compulsion test, as bases for state action by NewsGuard. (Pl. NG Opp. 8-18). Beginning with the public function test, then, "a private entity may qualify as a state actor when it exercises 'powers traditionally exclusively reserved to the State.'" *Halleck*, 587 U.S. at 809 (quoting *Jackson* v. *Metro. Edison Co.*, 419 U.S. 345, 352 (1974)). "The fact '[t]hat a private entity performs a function which serves the public does not make its acts [governmental] action.'" *S.F. Arts & Athletics, Inc.* v. *U.S. Olympic Comm.*, 483 U.S. 522, 544 (1987) (alterations in original) (quoting *Rendell-Baker*, 457 U.S. at 842). "Rather, to qualify as a traditional, exclusive public function ... , the government must have traditionally *and* exclusively performed the function." *Halleck*, 587 U.S. at 809 (citing *Rendell-Baker*, 457 U.S. at 842; *Jackson*, 419 U.S. at 352-53). The Supreme Court "has stressed that 'very few' functions fall into that category." *Id.* (quoting *Flagg Bros., Inc.* v. *Brooks*, 436 U.S. 149, 158 (1978)). Indeed, the Supreme Court has only ever identified two "traditional and exclusive" public functions: (i) running elections and (ii) operating a company town. *Id.* at 809-10 (collecting cases). Conversely, it has "ruled that

13

a variety of functions do not fall into that category." *Id.* at 810 (collecting

cases).  Moreover, "[t]he fact that the government ... contracts with ... a private

entity does not convert the private entity into a state actor — *unless the private*

*entity is performing a traditional, exclusive public function.*" *Id.* at 814

(emphasis added) (collecting cases); *see also Rendell-Baker*, 457 U.S. at 841

(holding that acts of a private corporation "do not become acts of the

government by reason of [its] significant or even total engagement in

performing public contracts").

Plaintiff claims that NewsGuard works "in the intelligence field, a

traditional function of government."  (SAC ¶ 27; *see also* Pl. NG Opp. 8-12).

However, intelligence gathering is not "traditionally *and* exclusively" performed

by the Government.  *Halleck*, 587 U.S. at 809.  Even if intelligence gathering

about national security and foreign policy matters were traditionally performed

by the Government, the Court agrees with NewsGuard that many private

entities, such as "journalists, private investigators, and national security-

focused consultants and technology companies[, ] also engage in intelligence

gathering."  (NG Br. 11).  Such private entities are known to gather intelligence

about the influence of foreign "propaganda," which can indeed be an "ordinary

civil activity" rather than "decidedly part of a military operation," as Plaintiff

argues.  (Pl. NG Opp. 9).  *See, e.g.*, Brandy Zadrozny, *The Pipeline: How*

*Russian Propaganda Reaches and Influences the U.S.*, NBC News (Oct. 16,

2024), www.nbcnews.com/specials/russian-disinformation-2024-election-

storm-1516 (reporting that "one prong of Russia's propaganda operation"

created "false narratives" aimed at "diminish[ing] Western support for military aid in Ukraine following Russia's invasion, a contentious issue"); Steven Lee Myers & Adam Satariano, *Russian Disinformation Campaigns Eluded Meta's Efforts to Block Them*, N.Y. Times (Jan. 17, 2025), www.nytimes.com/2025/01/17/business/russia-disinformation-meta.html (reporting, "according to three organizations that track disinformation online," that a Russian organization posted political advertisements on Facebook as part of a "sophisticated influence operation" aimed at "spread[ing] propaganda and disinformation, often about the war in Ukraine").  In short, as intelligence gathering is not exclusively a government function, Plaintiff cannot satisfy the public function test.

Nor can Plaintiff satisfy the joint action/close nexus test.  "[T]he fact that a private entity contracts with the government or receives governmental funds or other kinds of governmental assistance does not automatically transform the conduct of that entity into state action."  *Abadi* v. *Am. Airlines, Inc.*, No. 23 Civ. 4033 (LJL), 2024 WL 1346437, at *20 (S.D.N.Y. Mar. 29, 2024) (citing *Rendell-Baker*, 457 U.S. at 840-42; *S.F. Arts & Athletics*, 483 U.S. at 544; *Fabrikant*, 691 F.3d at 207).  "It is not enough … for a plaintiff to plead state involvement in '*some activity* of the institution alleged to have inflicted injury upon a plaintiff'; rather, the plaintiff must allege that the state was involved 'with the *activity that caused the injury*' giving rise to the action."  *Sybalski* v. *Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257-58 (2d Cir. 2008) (per curiam) (quoting *Schlein* v. *Milford Hosp., Inc.*, 561 F.2d 427, 428 (2d Cir. 1977)

(internal quotation marks and citation omitted) (emphases added)).  "A private actor can only be a willful participant in joint activity with the [s]tate or its agents if the two share some common goal to violate the plaintiff's rights." *Abadi*, 2024 WL 1346437, at *20 (alteration in original) (quoting *Betts* v. *Shearman*, 751 F.3d 78, 85 (2d Cir. 2014) (internal quotation marks omitted)). "The touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the [government]." *Forbes* v. *City of New York*, No. 05 Civ. 7331 (NRB), 2008 WL 3539936, at *5 (S.D.N.Y. Aug. 12, 2008) (quoting *Ginsberg* v. *Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999)).

Plaintiff argues that there was a "meeting of the minds" between the Government and NewsGuard to "share and work mutually toward the identical interest in identifying and suppressing" foreign propaganda, sufficient to constitute joint action.  (Pl. NG Opp. 14-17 (citing *Forbes*, 2008 WL 3539936, at *5 (citing *Adickes* v. *Kress & Co.*, 398 U.S. 144, 158 (1970))).  However, it is not enough that the Government and NewsGuard shared and worked toward a mutual objective of identifying foreign propaganda.  If such activity toward shared goals were sufficient, then every government contractor would be transformed into a state actor, contrary to well-settled law.  *Cf. Rendell-Baker*, 457 U.S. at 841.  Rather, courts must look to the degree of control exercised by the Government over an entity's decision-making, such as whether it appointed board members or had a say in the contractor's management or personnel decisions.  *See Grogan*, 768 F.3d at 269; *Sybalski*, 546 F.3d at 259; *Gitter* v.

16

*Target Corp.*, No. 14 Civ. 4460 (DLC), 2015 WL 5710454, at *3 (S.D.N.Y. Sept. 29, 2015).

Plaintiff alleges that NewsGuard is "working with the Intelligence Community," "acting at the behest of the Intelligence Community," and "is closely associated with the U.S. intelligence and defense community." (SAC ¶¶ 22-23). The same can be said of any government contractor. The operative question is to what degree the contractor's decision-making is controlled by the Government. To the extent the Court can consider the excerpts from the websites of Cyber Command and NewsGuard that Plaintiff includes in its opposition brief (Pl. NG Opp. 15-17),[2] these excerpts only go to their shared goals. Put simply, the Second Amended Complaint lacks sufficient allegations that the Government controlled NewsGuard's decision-making process and internal operations; accordingly, Plaintiff's First Amendment claim against NewsGuard fails as a matter of law.[3]

---

[2]    *See, e.g.*, *Goode* v. *Westchester County*, No. 18 Civ. 2963 (NSR), 2019 WL 2250278, at *2 (S.D.N.Y. May 24, 2019) ("[T]he court can only consider facts raised in the pleading and not those introduced in the opposition papers."); *Maxim Grp. LLC* v. *Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 308 (S.D.N.Y. 2010) (confirming that "a party cannot amend its pleading through its opposition brief" (collecting cases)).

[3]    Even if Plaintiff had sufficiently pleaded that NewsGuard was a state actor, the Second Amended Complaint suffers from another pleading deficiency: it does not sufficiently allege that the injury Plaintiff suffered arose from NewsGuard's contract with the Government. Plaintiff alleges that NewsGuard contracted with the Government under the Misinformation Fingerprints contract from September 2021 through December 2022 to identify news organizations that publish Russian propaganda about the Ukraine war. (SAC ¶¶ 3, 19-24, 27, 29, 39, 137-47). Plaintiff alleges that "NewsGuard's labelling, stigmatizing[,] and targeting of *Consortium News* … is within the scope of its contract with the United States and is performed as part of that contract." (*Id.* ¶ 20). Indeed, Plaintiff alleges that "NewsGuard's labelling of *Consortium News* articles as to Ukraine is [ ] part and parcel of this 'Misinformation Fingerprints' program." (*Id.* ¶ 145). However, the Second Amended Complaint also alleges that NewsGuard is a private, for-profit corporation that provides a "Nutrition Labels" service for rating the trustworthiness and reliability of news organizations, with approximately 40,000 subscribers, including

17

2.    **The Court Dismisses Plaintiff's First Amendment Claim
       Against the United States Under Rules 12(b)(1) and 12(b)(6)**

The Court dismisses Plaintiff's First Amendment claims against the

United States on (somewhat) overlapping Rule 12(b)(1) and Rule 12(b)(6)

grounds.  *First*, the Court recognizes that it has no jurisdiction over *Bivens*-

type claims against the United States, as distinguished from individual officers.

*Second*, even if Plaintiff's *Bivens* claim were construed as a claim against an

individual officer, there is no *Bivens* claim available for the alleged violation of

Plaintiff's First Amendment rights.  *Third*, Plaintiff lacks standing to seek

injunctive relief for the alleged First Amendment violation because the

Misinformation Fingerprints contract has ended.  *Fourth and finally*, though

Plaintiff's claim for declaratory relief is redressable, it is barred on several

independent grounds.

a.    **No Damages Claim Is Available Against the United States
       for First Amendment Violations**[4]

i.    **The United States Has Not Waived Sovereign
       Immunity for Such a Claim**

To begin, Plaintiff's First Amendment claim for damages against the

United States is barred by sovereign immunity.  Plaintiff seeks "unspecified

---

institutional, governmental, and other clients.  (*Id.* ¶¶ 31-32).  That NewsGuard's rating
of Plaintiff's website derives from Misinformation Fingerprints program, and not from
the Nutrition Labels program (which exists independently of NewsGuard's contract with
the Government), amounts to "pure speculation, supported not by facts but by only
conclusory statements."  *McDougal* v. *Fox News Network, LLC*, 489 F. Supp. 3d 174,
185 (S.D.N.Y. 2020).  Similarly, that NewsGuard's ratings of Plaintiff's website covered
areas subject to the Misinformation Fingerprints contract (*see* SAC ¶¶ 143-146) is
insufficient to nudge Plaintiff's allegations over the line from a possible to a plausible
entitlement to relief.  *See Iqbal*, 556 U.S. at 678.

[4]    Plaintiff asserts that NewsGuard "is liable in injunctive and declaratory relief [for]
continued violations, even though *Bivens*-type damages are not available for the
constitutional tort" (Pl. NG Opp. 18), and it purports to "preserve[ ] all claims of

18

monetary damages as a result of the harm it has experienced from the above-described conduct of the United States … in direct violation of the First and Fifth Amendments." (SAC ¶ 157(a)). The Government must waive sovereign immunity for this sort of relief, and it has not.

"Absent an unequivocally expressed statutory waiver, the United States, its agencies, and its employees (when functioning in their official capacities) are immune from suit based on the principle of sovereign immunity." *Sebelius*, 605 F.3d at 140 (internal quotation marks omitted). "Congress has not waived the United States' sovereign immunity with respect to constitutional tort claims." *Davila* v. *Gutierrez*, 330 F. Supp. 3d 925, 937 (S.D.N.Y. 2018) (citing *FDIC* v. *Meyer*, 510 U.S. 471, 478 (1994)), *aff'd*, 791 F. App'x 211 (2d Cir. 2019) (summary order). Accordingly, constitutional tort claims "must be brought against individual federal agents or employees in their individual capacities through a *Bivens* action." *Id.* Precisely for this reason, courts routinely dismiss *Bivens*-type actions against the United States for lack of subject matter jurisdiction. *Id.*; *see also Keene Corp.* v. *United States*, 700 F.2d 836, 845 n.13 (2d Cir. 1983). Plaintiff brings a constitutional tort claim directly against the United States, rather than against an individual officer.

---

injunctive and declaratory relief against the U.S. *and NewsGuard as its agent*" (Pl. Gov't Opp. 25 n.3 (emphasis added)). To repeat, NewsGuard is not a state actor. (*See supra* B.1). Even if it were, *Bivens* actions may not be brought against private corporations, such as NewsGuard, "because the Supreme Court has expressly 'foreclose[d] the extension of *Bivens* to private entities.'" *Offor* v. *Mercy Med. Ctr.*, No. 17 Civ. 1872 (NRB), 2018 WL 2947971, at *6 (S.D.N.Y. May 31, 2018) (alteration in original) (quoting *Corr. Servs. Corp.* v. *Malesko*, 534 U.S. 61, 66 n.2 (2001)); *see also Bender* v. *GSA*, 539 F. Supp. 2d 702, 708 (S.D.N.Y. 2008) ("*Bivens* actions may not be brought against private corporations, even when they act under the color of federal law.").

(*See* SAC, Count I). Therefore, the Court dismisses this claim against the United States for lack of subject matter jurisdiction under Rule 12(b)(1).

### ii.    There Is No *Bivens* Remedy for Plaintiff's First Amendment Claim

Assuming *arguendo* that Plaintiff's claim could be construed as a claim against an individual officer of the United States, the Court would still dismiss Plaintiff's claim for failing to state a claim under Rule 12(b)(6) because no *Bivens* remedy is available for the alleged conduct.

*Bivens* recognized an implied cause of action under the Constitution for damages arising out of constitutional torts by federal officers, specifically, unlawful searches and seizures. *See Bivens* v. *Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971). The Supreme Court subsequently extended *Bivens* to cover two additional constitutional claims, in addition to unlawful searches and seizures: in *Davis* v. *Passman*, 442 U.S. 228, 243-44 (1979), the Court recognized an implied cause of action under the Fifth Amendment Due Process Clause for gender discrimination; and in *Carlson* v. *Green*, 446 U.S. 14, 20 (1980), the Court recognized a cause of action under the Eighth Amendment for a federal prisoner's claim for failure to provide adequate medical treatment. However, "[t]hese three cases — *Bivens, Davis,* and *Carlson* — represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Ziglar* v. *Abbasi*, 582 U.S. 120, 131 (2017). The Supreme Court has repeatedly made clear that "expansion of *Bivens* is a disfavored judicial activity." *Hernandez* v. *Mesa*, 589

U.S. 93, 101 (2020) (internal quotation marks omitted); *accord Egbert* v. *Boule*, 596 U.S. 482, 491 (2022).

Ordinarily, when evaluating a *Bivens* claim, courts conduct a two-step inquiry, first asking (i) whether the case presents a "new context" because it is different in a meaningful way from previous *Bivens* cases decided by the Supreme Court, and then asking (ii) if there are "special factors counselling hesitation in the absence of affirmative action by Congress." *Ziglar*, 582 U.S. at 136 (internal quotation marks omitted). "[These] steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert*, 596 U.S. at 492. Distilled even further, "the *Egbert* Court made clear that, effectively, [the test] operates as a bar to a *Bivens* claim in all cases except, perhaps, those involving Fourth, Fifth[,] and Eighth Amendment claims factually indistinguishable from *Bivens*, *Passman*, or *Carlson*." *Cohen* v. *United States*, 640 F. Supp. 3d 324, 337 (S.D.N.Y. 2022), *aff'd sub nom. Cohen* v. *Trump*, No. 23-35, 2024 WL 20558 (2d Cir. Jan. 2, 2024) (summary order).

Plaintiff correctly concedes that it is unable to bring a *Bivens* claim for any First Amendment violations. (Pl. Gov't Opp. 25 n.3). The Supreme Court has "never held that *Bivens* extends to First Amendment claims," *Reichle* v. *Howards*, 566 U.S. 658, 663 n.4 (2012), and in fact has specifically held that "there is no *Bivens* action for First Amendment retaliation," *Egbert*, 596 U.S. at 499. Furthermore, the Second Circuit has "not recognized a *Bivens* action sounding in the First Amendment." *Zherka* v. *Ryan*, 52 F. Supp. 3d 571, 579

(S.D.N.Y. 2014).  Given these facts, this Court will not extend *Bivens* to provide a cause of action for Plaintiff's alleged violation of its First Amendment rights, and dismisses Plaintiff's First Amendment claim against the Government with prejudice.[5]

### b.    Plaintiff Lacks Standing to Pursue Injunctive Relief

The Court lacks jurisdiction over Plaintiff's First Amendment claim against the Government for another, independent reason:  Plaintiff lacks standing to seek injunctive relief because it has alleged only a past injury, which cannot be redressed by prospective equitable relief in the form of an injunction.

Where a plaintiff seeks prospective equitable relief, past injury does not suffice for Article III standing unless the plaintiff can demonstrate that it is likely to be harmed again in the future in a similar way.  *City of Los Angeles* v. *Lyons*, 461 U.S. 95, 111-12 (1983); *Dorce* v. *City of New York*, 2 F.4th 82, 95 (2d Cir. 2021); *Nicosia* v. *Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016). Past wrongs, standing alone, "'do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy' with respect to potential future similar wrongs."  *Dorce*, 2 F.4th at 96 (quoting *Lyons*, 461 U.S. at 103).  "That a past harm was severe or inflicts continuing

---

[5]    To the extent Plaintiff attempts to allege a violation of the Fifth Amendment (*see* SAC ¶¶ 4, 157(a), 157(a)(8)), the Court does not find its fleeting references to the Fifth Amendment in the Second Amended Complaint sufficient to state a plausible claim, especially since Count I explicitly alleges a "First Amendment [v]iolation" (SAC, Count I), and Plaintiff makes no mention of a Fifth Amendment claim in its opposition briefs (*see generally* Pl. NG Opp.; Pl. Gov't Opp.).

damage does not change that rule: the remedy for continuing pain and suffering from a defendant's past damage is compensatory damages, as an injunction against future actions by a defendant does not remedy the harm done by that defendant's past acts." *Id.* at 96; *see also Nicosia*, 834 F.3d at 239.

In the instant case, Plaintiff's First Amendment injury derives, if at all, from the Misinformation Fingerprints contract between NewsGuard and the Government. (*See, e.g.*, SAC ¶¶ 3, 19-20, 24, 26, 29-30, 39, 42, 137-139, 143, 146-152). The parties dispute whether this contract is ongoing. In this procedural context, Defendants are "permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the [p]leading." *Carter* v. *HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016). "In opposition to such a motion, the plaintiffs … need to come forward with evidence of their own to controvert that presented by the defendant[.]" *Id.* "If the extrinsic evidence presented by the defendant is material and controverted, the district court will need to make findings of fact in aid of its decision as to standing." *Id.*

Plaintiff alleges that the Misinformation Fingerprints contract is "continuing," citing a March 2023 email from NewsGuard's co-CEO Gordon Crovitz in which Crovitz described NewsGuard's work pursuant to the contract in the present tense. (SAC ¶¶ 140-141 & Ex. K). Yet, at the same time, Plaintiff acknowledges that the Misinformation Fingerprints contract ended on December 8, 2022. (*Id.* ¶ 138). Hoping to provide clarity, the Government proffers the declaration of USAF contracting officer Jonathan P. Bettin, who

attests that the "performance period for [the Misinformation Fingerprints] contract ended on December 8, 2022" (Bettin Decl. ¶ 5), and, more generally, that "[t]he contractual relationship between [the USAF] and NewsGuard regarding [the Misinformation Fingerprints contract] ended on December 8, 2022" (*id.* ¶ 6).  Plaintiff reverts to the Crovitz email (Pl. Gov't Opp. 5), taking issue with Bettin's attestation that NewsGuard delivered the final "deliverable" under the contract on April 16, 2023, nearly six months after Bettin says the contract ended (*id.* at 4-5 (citing Bettin Decl. ¶ 5)), and citing more present-tense descriptions regarding NewsGuard's licensing of its data to U.S. Cyber Command and "other government and defense entities," and its receipt of revenue "from government entities" (*id.* at 5-6).

Giving due consideration to Plaintiff's examples, the Court still finds that Plaintiff has not satisfied its burden to demonstrate a present injury or a "real and immediate threat" of future injury.  *Lyons*, 461 U.S. at 102.  In effect, Plaintiff does not controvert anything in Bettin's declaration, including the contract end date, and therefore has not satisfied its "burden … to satisfy the Court, as fact-finder, of the jurisdictional facts."  *Guadagno* v. *Wallack Ader Levithan Assoc.*, 932 F. Supp. 94, 95 (S.D.N.Y. 1996).  As such, "no presumptive truthfulness attaches to the complaint's jurisdictional allegations," *Massone on behalf of United States Sec. Officers* v. *Washington*, No. 20 Civ. 7906 (LJL), 2021 WL 3863081, at *2 (S.D.N.Y. Aug. 30, 2021) (internal quotation marks omitted), namely, that the contract is continuing.  Likewise, the additional present-tense statements from NewsGuard's website

24

do not refer to the Misinformation Fingerprints contract; thus, they are insufficiently specific "[i]n the face of the detailed declaration provided by" the Government. *Toro* v. *Medbar Corp.*, No. 23 Civ. 6878 (AS) (JLC), 2024 WL 2308804, at *4 (S.D.N.Y. May 22, 2024), *report and recommendation adopted*, No. 23 Civ. 6878 (AS), 2024 WL 2882899 (S.D.N.Y. June 7, 2024).

What is more, even if NewsGuard's continued flagging of Plaintiff's website constituted a continuing injury (*see* Pl. Gov't Opp. 8-9), absent a continuing contract, Plaintiff's alleged injury would not be redressable by injunctive relief against the Government, and thus Plaintiff's claim fails for lack of standing on this ground, too. Plaintiff seeks to "permanently enjoin[ ]" the Misinformation Fingerprints program and to prevent the labeling of its articles and videos. (SAC ¶ 157(a)(6)-(7)). However, the lack of a continuing contract between NewsGuard and the Government precludes Plaintiff from establishing redressability.

"To satisfy the redressability element of Article III standing, a plaintiff must show that it is 'likely as opposed to merely speculative, that the [alleged] injury will be redressed by a favorable decision.'" *Soule* v. *Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 47 (2d Cir. 2023) (alteration in original) (quoting *Lujan*, 504 U.S. at 561). "A plaintiff makes this showing when the relief sought 'would serve to ... eliminate any effects of' the alleged legal violation that produced the injury in fact." *Id.* (omission in original) (quoting *Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 105-06 (1998)). Here, an injunction could not "plausibly redress the injury." *Id.* at 48. *First*, as established, the

Misinformation Fingerprints contract has already ended.  (*See* Bettin Decl. ¶ 5).[6]  *Second*, even if NewsGuard initially began flagging and labeling Plaintiff's articles pursuant to the Misinformation Fingerprints contract, regardless of any injunction against the Government, NewsGuard can continue flagging and labeling Plaintiff's articles of its own accord, pursuant to its "'brand safety' validation services."  (SAC ¶ 31).  *See Murthy* v. *Missouri*, 603 U.S. 43, 73 (2024) (finding that plaintiffs "ha[d] a redressability problem" where, "without evidence of continued pressure from the [Government], it appears that the [private entities] remain free to enforce, or not to enforce [the allegedly violative] policies").

Finally, the Court denies Plaintiff's request for jurisdictional discovery on the issue of standing.  (*See* Pl. Gov't Opp. 6-7).  A party seeking jurisdictional discovery bears the burden of showing that the requested discovery "is *likely* to produce the facts needed to establish jurisdiction."  *Haber* v. *United States*, 823 F.3d 746, 750 (2d Cir. 2016) (emphasis added).  In its supplemental brief, Plaintiff asserts that the Attorney General's investigation pursuant to Executive

---

[6]    Moreover, the Court agrees with NewsGuard's argument that the President's recent Executive Order makes injunctive relief even less likely to redress the injury.  The Executive Order purports to prohibit the Government from engaging in any conduct that would "abridge the free speech of any American citizen" including, specifically, combating "misinformation," "disinformation," and "malinformation" on online platforms.  Executive Order 14149, *Restoring Freedom of Speech and Ending Federal Censorship*, 90 Fed. Reg. 8243, 8243 (Jan. 20, 2025).  NewsGuard claims that this means Plaintiff "would not be entitled to injunctive relief because the Executive Order makes clear there will be no similar contract between NewsGuard and the United States at any point in the foreseeable future." (NG Supp. Br. 3).  The Court agrees that the Executive Order makes a similar contract — and similar conduct by the Government in the near future — less likely and, therefore, casts further doubt on the redressability of Plaintiff's injury.

Order 14149 "is likely to identify evidence as to NewsGuard's relationship with
the Government." (Pl. Supp. Br. 2). However, Plaintiff does not explain why
this would likely lead to the discovery of evidence of an ongoing contractual
relationship. Thus, the Court agrees with the Government that "Plaintiff has
not even attempted … to make any showing that the discovery it seeks is *likely*
to produce evidence that the Government and NewsGuard have some
continuing relationship despite the contract between them having long
concluded." (Gov't Supp. Br. 2; *see also* NG Supp. Br. 3).

### c.    Plaintiff Cannot Pursue Declaratory Relief Against Defendants

Plaintiff also seeks a declaratory judgment stating that Defendants
violated its First Amendment rights; that the Misinformation Fingerprints
program is unconstitutional; and that Defendants are continuing to act in
violation of the First Amendment. (SAC ¶ 157(a)). And though claims for
declaratory relief are analyzed differently for standing purposes, the Court finds
that Plaintiff lacks standing even to seek declaratory relief.

By way of background, claims for injunctive and declaratory relief require
distinct standing analyses. The Second Circuit in *Dorce* v. *City of New York* —
the case on which the Government relies — drew no distinction between
injunctive and declaratory relief. (*See* Gov't Br. 9-10). The plaintiffs in *Dorce*
sought a declaratory judgment that New York City's Third Party Transfer
program was unconstitutional, as well as an injunction barring the City from
continuing to foreclose on and transfer property under the program. *See* 2
F.4th at 95. The Second Circuit held that the plaintiffs lacked standing to seek

"such relief" because they had not demonstrated that they would be subject to future harm caused by the program.  *Id.*; *see also id.* ("Where, as here, plaintiffs seek *injunctive or declaratory relief*, they cannot rely on past injury to satisfy the injury requirement[.]" (emphasis added) (internal quotation marks omitted)); *id.* ("[I]t is clear that the existence of an official policy, on its own, is not sufficient to confer standing to sue *for injunctive and declaratory relief* on any individual who had previously been subjected to that policy[.]" (emphasis added) (internal quotation marks omitted and alterations adopted)).

However, in *Uzuegbunam* v. *Preczewski*, the Supreme Court held that, "for the purpose of Article III standing, nominal damages provide the necessary redress for a completed violation of a legal right," 592 U.S. 279, 293 (2021), and in so holding, the Court equated nominal damages with declaratory relief, *see id.* at 285-86.  In *Uzuegbunam*, two students sued several college officials for violating their First Amendment rights and sought "nominal damages and injunctive relief."  *Id.* at 284.  After the college officials abandoned their policy — and all agreed that injunctive relief was no longer available — the students continued to seek nominal damages.  *Id.*  The respondents stressed the "declaratory function" of these nominal damages.  *Id.* at 286.  The Court followed suit and began by noting that "[b]oth sides agree that nominal damages historically could provide prospective relief," because "[t]he award of nominal damages was one way for plaintiffs at common law to obtain a form of

*declaratory relief* in a legal system with no declaratory judgment act." *Id.* at

285-86 (emphasis added) (internal quotation marks omitted).[7]

After concluding that a request for nominal damages could satisfy the

redressability element of standing, *Uzuegbunam*, 592 U.S. at 292, the Supreme

Court applied the principle to the facts of the case, and found that "nominal

damages can redress Uzuegbunam's injury even if he cannot … quantify that

harm in economic terms," because he "experienced a completed violation of his

constitutional rights when respondents enforced their speech policies against

him." *Id.* at 293.  The Court also stressed that a request for nominal damages

does not "guarantee[ ] entry to court." *Id.* at 292.  Rather, "[i]t remains for the

plaintiff to establish the other elements of standing (such as a particularized

injury); plead a cognizable cause of action; and meet all other relevant

requirements." *Id.* at 293 (internal citation omitted).

*This* is the hurdle at which Plaintiff's claim for declaratory relief falls.

For one thing, whether Plaintiff "experienced a completed violation of [its]

constitutional rights" remains an open question.  592 U.S. at 293.  For

another, as discussed, Plaintiff has failed to demonstrate a present injury or a

"real and immediate threat" of future injury.  *Lyons*, 461 U.S. at 102; *see*

*Clementine Co. LLC* v. *Adams*, No. 21 Civ. 7779 (CM), 2022 WL 4096162, at *3

(S.D.N.Y. Sept. 7, 2022) (declining to address an *Uzuegbunam*-based argument

that plaintiff's claim for nominal damages was redressable because plaintiff

---

[7]    The Second Circuit has held, in light of *Uzuegbunam*, that a claim for nominal damages
and declaratory relief is "plainly not moot" and can satisfy the redressability
requirement.  *Clementine Co., LLC* v. *Adams*, 74 F.4th 77, 83 (2d Cir. 2023).

had not established the injury-in-fact or traceability elements of standing), *aff'd*, 74 F.4th 77 (2d Cir. 2023); *Kumpf* v. *N.Y. State United Tchrs.*, 642 F. Supp. 3d 294, 307 (N.D.N.Y. 2022) (concluding that "*Uzuegbunam* does not save [the p]laintiff's declaratory form of relief" because she failed to "present an immediate, real, and substantial controversy that is redressable through declaratory relief," and thus "declaring [the d]efendants' actions or the [law] unconstitutional … would [not] provide [the p]laintiff with any relief, let alone 'effectual relief'" (quoting *Uzuegbunam*, 592 U.S. at 282) (citing *Preiser* v. *Newkirk*, 422 U.S. 395, 402 (1975))).  Moreover, as NewsGuard points out in its supplemental brief, Plaintiff's claims for declaratory and injunctive relief are likely moot due to the cessation of the Misinformation Fingerprints contract. (NG Supp. Br. 2 (citing *Clementine*, 2022 WL 4096162, at *1)).  And regardless of standing, Plaintiff's claim is barred by sovereign immunity.  Absent an unequivocally expressed statutory waiver, the United States is immune from suit.  *Sebelius*, 605 F.3d at 140.  "[W]aivers of sovereign immunity … cannot simply be implied."  *Adeleke* v. *United States*, 355 F.3d 144, 150 (2d Cir. 2004) (quoting *United States* v. *Nordic Vill., Inc.*, 503 U.S. 30, 33 (1992)).  Plaintiff has not identified a statute expressly waiving sovereign immunity for such a claim. (*See generally* SAC; Pl. Gov't Opp.).  Thus, no declaratory relief is available against the United States.

### d. Alternatively, the Court Could Dismiss Plaintiff's First Amendment Claim Against the Government Under Rule 12(b)(6)

Even if NewsGuard were a state actor, and even if Plaintiff had cleared the various procedural hurdles foreclosing its claim against the Government, Plaintiff has not sufficiently alleged a First Amendment violation. As a preliminary matter, because the Court has determined that it lacks subject-matter jurisdiction, it should not ordinarily consider the merits of Plaintiff's claims. *See Oliveras* v. *United States*, 371 F. Supp. 3d 105, 113-14 (S.D.N.Y. 2019) (citing *Cornwell* v. *Credit Suisse Grp.*, 666 F. Supp. 2d 381, 385-86 (S.D.N.Y. 2009) ("[A]bsent authority to adjudicate, the Court lacks a legal basis to grant any relief, or even consider the action further.")). However, when the jurisdictional issues are "complex," *see Carr* v. *DeVos*, 369 F. Supp. 3d 554, 562 (S.D.N.Y. 2019), as is the standing issue here, it is possible that the Second Circuit might arrive at a contrary conclusion, *see S.G.* v. *Success Acad. Charter Schs., Inc.*, No. 18 Civ. 2484 (KPF), 2019 WL 1284280, at *16 n.12 (S.D.N.Y. Mar. 20, 2019), and the Court may choose to address the merits as an alternative ground for dismissal in the interest of "efficiency," *see Carr*, 369 F. Supp. 3d at 562. Indeed, courts frequently choose to do so. *See, e.g.*, *Cellucci* v. *O'Leary*, No. 19 Civ. 2752 (VEC), 2021 WL 242806, at *5 (S.D.N.Y. Jan. 25, 2021); *Barton* v. *Ne. Transp., Inc.*, No. 21 Civ. 326 (KMK), 2022 WL 203593, at *9 (S.D.N.Y. Jan. 24, 2022); *McQueen-Starling* v. *Best of Long Island Props. Inc.*, No. 20 Civ. 504 (AMD) (LB), 2022 WL 4586354, at *3 n.3 (E.D.N.Y.

Sept. 29, 2022).  The Court therefore proceeds to address the merits of Plaintiff's First Amendment claims.

Plaintiff articulates two theories of First Amendment violations on the part of either the Government or NewsGuard: (i) coercive conduct and (ii) viewpoint discrimination.  Neither has merit, and the President's recent Executive Order on this topic does not alter the Court's analysis.  Accordingly, the Court also has an independent basis to dismiss Plaintiff's First Amendment claim under Rule 12(b)(6).

### i.    Plaintiff Does Not Plausibly Allege Coercive Conduct

"When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."  *Wandering Dago, Inc.* v. *Destito*, 879 F.3d 20, 34 (2d Cir. 2018) (quoting *Walker* v. *Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015)).  "When it acts as a speaker, the government is entitled to favor certain views over others."  *Id.* (citing *Walker*, 576 U.S. at 216-17); *see also Matal* v. *Tam*, 582 U.S. 218, 234 (2017).  "A government official can share her views freely and criticize particular beliefs, and she can do so forcefully in the hopes of persuading others to follow her lead."  *Nat'l Rifle Ass'n of Am.* v. *Vullo*, 602 U.S. 175, 188 (2024).  "Indeed, it is not easy to imagine how government could function if it lacked this freedom."  *Pleasant Grove City, Utah* v. *Summum*, 555 U.S. 460, 468 (2009).

Of course, "[t]his does not mean that there are no restraints on government speech."  *Summum*, 555 U.S. at 468.  Government officials cannot "use the power of the [s]tate to punish or suppress disfavored expression."

32

*Vullo*, 602 U.S. at 188 (citing *Rosenberger* v. *Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995) ("[I]deologically driven attempts to suppress a particular point of view are presumptively unconstitutional[.]" (internal quotation marks omitted))).  "[T]he First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions and other means of coercion … to achieve the suppression' of disfavored speech."  *Id.* at 189 (omission in original) (quoting *Bantam Books, Inc.* v. *Sullivan*, 372 U.S. 58, 67 (1963)).

"To state a claim that the government violated the First Amendment through coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech."  *Vullo*, 602 U.S. at 191 (citing *Bantam Books*, 372 U.S. at 67-68). "Considerations like who said what and how, and what reaction followed, are just helpful guideposts in answering the question whether an official seeks to persuade or, instead, to coerce."  *Id.*  In seeking to answer this question, in *Bantam Books*, the Court considered, *inter alia*, "the commission's coordination with law enforcement and its authority to refer matters for prosecution."  *Id.* at 189 (citing *Bantam Books*, 372 U.S. at 66-68).  In *Vullo*, a unanimous opinion, the Court considered the "power that a government official wields" (specifically, "the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official"), *id.* at 191-92; whether the government official "could initiate investigations and refer cases for

prosecution" or "notice civil charges and … impose significant monetary penalties," *id.* at 192; communications with allegedly coerced parties "[a]gainst this backdrop," *id.* at 192-93; and the allegedly coerced parties' reaction, *id.* at 193.  Indeed, the Supreme Court in *Vullo* faulted the Second Circuit below for "fail[ing] to analyze the [state's] Guidance Letters and press release *against the backdrop of other allegations in the complaint.*"  *Id.* at 195 (emphasis added).

Here, Plaintiff does not plausibly allege coercion because it fails to identify a "threat of adverse government action" meant to punish or suppress First Amendment protected speech.  *Vullo*, 602 U.S. at 191.  Setting aside the conclusory allegations that Defendants "retaliate[ed]"[8] against (*see* SAC ¶¶ 150, 154, 157(a)(4)) and "coerce[d]" Plaintiff (*see id.* ¶¶ 24, 41, 45, 47, 155, 157(a)(3)-(4)), the thrust of Plaintiff's allegations is that NewsGuard violated the First Amendment by working with the Government "to publicly label, target[,] and stigmatize news organizations" that "differ or dissent from U.S. policy in connection with Russia or Ukraine" (*id.* ¶ 151).  However, Plaintiff cannot establish that this labeling, targeting, and stigmatization "viewed in context,

---

[8]    Although Plaintiff makes passing reference to retaliation in the Second Amended Complaint (*see* SAC ¶¶ 150, 154, 157(a)(3)-(4)), once in its brief in opposition to NewsGuard's motion to dismiss (*see* Pl. NG Opp. 5), and in its brief in opposition to the Government's motion to dismiss (*see* Pl. Gov't Opp. 14, 15, 18, 19), nowhere does Plaintiff (or either defendant, for that matter) address the elements of a First Amendment retaliation claim.  *See, e.g., Pen Am. Ctr., Inc.* v. *Trump*, 448 F. Supp. 3d 309, 326 (S.D.N.Y. 2020) ("Regarding the separate theory of First Amendment retaliation, a plaintiff must allege: [i] he has a right protected by the First Amendment; [ii] the defendant's actions were motivated or substantially caused by his exercise of that right; and [iii] the defendant's actions caused him some injury." (internal quotation marks omitted)).  As this is a separate theory of liability — indeed, Justice Jackson in her *Vullo* concurrence separately addressed the bearing of the retaliation analysis on the coercion analysis, *Nat'l Rifle Ass'n of Am.* v. *Vullo*, 602 U.S. 175, 201-04 (2024) (Jackson, J., concurring) — that was not properly briefed, the Court does not address it in this Opinion.

could be reasonably understood to convey a *threat of adverse government action*." *Vullo*, 602 U.S. at 191 (emphasis added). The specter of a "red flag and warning that readers should 'proceed with caution', that the organization fails to meet journalistic standards, fails to correct errors[,] and publishes false information" (SAC ¶ 41), is a far cry from the threat of adverse government action. The threat of adverse government action means the possibility of criminal prosecution, *see Bantam Books*, 372 U.S. at 66-68; *Vullo*, 602 U.S. at 192, civil or regulatory sanctions, *see Vullo*, 602 U.S. at 192; *see also, e.g.*, *Pen Am. Ctr., Inc.* v. *Trump*, 448 F. Supp. 3d 309, 327 (S.D.N.Y. 2020) (finding threat of revoking security clearances sufficient threat of adverse government action), or other significant monetary penalties, *Vullo*, 602 U.S. at 192. Plaintiff alleges nothing like this. Nor does Plaintiff allege that a government official, wielding great authority, made these supposed threats. *Cf. Vullo*, 602 U.S. at 191-92. Instead, Plaintiff alleges that a "reporter" — using scare quotes to insinuate nefariousness — contacted the organization and demanded a correction of content the reporter deemed false. (SAC ¶ 41). If this reporter were in fact a government official, he would not be one wielding much authority. Moreover, every news organization that rebuffs a government press secretary's demand for a correction on pain of being labeled "fake news" surely does not have a First Amendment coercion claim. Absent the threat of adverse government action, the Government is, at most, merely "criticiz[ing] [Plaintiff's] beliefs … forcefully in the hopes of persuading others," *Vullo*, 602 U.S. at 188, as it is entitled to do, *id.*; *see also Summum*, 555 U.S. at 468.

Plaintiff directs the Court's attention to *Okwedy* v. *Molinari*, 333 F.3d 339 (2d Cir. 2003), in which the Second Circuit found that a threat to withhold a commercial lease in a letter from a borough president to an organization displaying a billboard with a disfavored message "could be found to contain an implicit threat of retaliation." *Id.* at 344. But *Okwedy* is distinguishable. The coercive threat therein was an implicit threat made by the Staten Island Borough President, on his official letterhead, in the form of a complaint about the plaintiff's inflammatory message on a third party's billboard. In the letter, the Borough President urged further discussion about the billboard in light of the billboard company's "substantial economic benefits from" Staten Island billboards. *Id.* at 341-42. Knowing which way the wind was blowing, the billboard company promptly took down the signs. *Id.* at 342. Unlike in *Okwedy*, Plaintiff has alleged no threat of substantial economic consequences. Plaintiff has alleged only that NewsGuard placed a warning label and red flag on its website. This is more like an "attempt[ ] to convince and [not an] attempt[ ] to coerce." *Id.* at 344. Thus, NewsGuard's alleged conduct is not "equally intrusive and coercive" as that of the defendant in *Okwedy* (Pl. Gov't Opp. 16), and Plaintiff fails to allege a plausible First Amendment coercion claim.

### ii.    Plaintiff Does Not Plausibly Allege Viewpoint Discrimination

Plaintiff also argues that Defendants engaged in "viewpoint discrimination" in violation of the First Amendment. (*See* Pl. Gov't Opp. 21-25). The Second Amended Complaint indeed contains several allegations about

Defendants' improper targeting of Plaintiff for its "viewpoints" on the Ukraine war and other issues related to Russia, which viewpoints were at odds with then-prevailing U.S. policies.  (*See* SAC ¶¶ 3, 20, 24, 29, 94, 105, 152).

"Viewpoint discrimination is a subset or particular instance of the more general phenomenon of content discrimination, in which the government targets not subject matter but particular views taken by speakers on a subject."  *Wandering Dago, Inc.*, 879 F.3d at 31 (internal quotation marks omitted).  "The government discriminates against viewpoints when it disfavors certain speech because of 'the specific motivating ideology or the opinion or perspective of the speaker.'"  *Id.* (quoting *Rosenberger*, 515 U.S. at 829).  At the same time, the prohibition on viewpoint discrimination "does not restrict the [government's] own speech, *which is controlled by different principles.*"  *Rosenberger*, 515 U.S. at 834 (emphasis added).  Indeed, "imposing a requirement of viewpoint-neutrality on government speech would be paralyzing."  *Matal*, 582 U.S. at 234; *see also Vullo*, 602 U.S. at 188; *Walker*, 576 U.S. at 207; *Summum*, 555 U.S. at 468; *Wandering Dago, Inc.*, 879 F.3d at 34.

Here, the Court finds that Plaintiff's claim of viewpoint discrimination centers on "government speech, rather than regulation of private speech," the latter of which would be subject to viewpoint-discrimination restrictions.  *Wandering Dago, Inc.*, 879 F.3d at 35.  Plaintiff cites inapposite cases[9]

---

[9]    Plaintiff also cites *Joint Anti-Fascist Refugee Comm.* v. *McGrath*, 341 U.S. 123 (1951), for the proposition that "the Supreme Court held that the First Amendment was violated where the effect of designating certain non-profit organizations as 'Communist' was to

concerning the administration of statutes, regulations, and the like in ways that violate viewpoint neutrality. *See, e.g.*, *Bd. of Regents of Univ. of Wisc. Sys.* v. *Southworth*, 529 U.S. 217, 221 (2000) (exaction of student fees); *Turner Broad. Sys., Inc.* v. *F.C.C.*, 512 U.S. 622, 626 (1994) (cable television regulation); *Rust* v. *Sullivan*, 500 U.S. 173, 177-78 (1991) (Title X funding recipient regulations); *Ark. Writers' Project, Inc.* v. *Ragland*, 481 U.S. 221, 223 (1987) (state sales tax scheme). Unlike in those cases, the Government here is not exercising its regulatory authority over private speech. It is not "silenc[ing] or muffl[ing] the expression of disfavored viewpoints. *Matal*, 582 U.S. at 235. NewsGuard's labeling hardly "raises the specter that the government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc.* v. *Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991). The Government does not require Plaintiff to do anything, and it is not depriving Plaintiff of certain benefits that it is doling out to those with favored viewpoints. The Government can tell the public which views it likes, and which views it does not like. That is paradigmatic government speech, akin to posters encouraging Americans to join a war effort. *See Matal*, 582 U.S. at 234-35 ("These posters expressed a viewpoint, but the First Amendment did not demand that the Government balance the message of these posters by producing and distributing posters encouraging Americans to refrain from

---

'cripple the functioning and damage the reputation of those organizations in their respective communities and in the nation.'" (Pl. Gov't Opp. 22 (quoting *McGrath*, 341 U.S. at 139-41)). However, the *McGrath* opinion was not decided on First Amendment grounds. And even if it had been, First Amendment doctrine has changed significantly since 1951.

engaging in these activities."). Here, too, Plaintiff fails to state a plausible First Amendment claim — this time for viewpoint discrimination — and so the Court has an independent basis under Rule 12(b)(6) to dismiss its claim.

### e. Executive Order 14149 Does Not Impact the Court's Analysis

Finally, in the legal equivalent of a "Hail Mary pass," Plaintiff directs the Court's attention to a recent Executive Order declaring that:

> Over the last [four] years, the previous administration trampled free speech rights by censoring Americans' speech on online platforms, often by exerting substantial coercive pressure on third parties, ... to moderate, deplatform, or otherwise suppress speech that the Federal Government did not approve. Under the guise of combatting "misinformation," "disinformation," and "malinformation," the Federal Government infringed on the constitutionally protected speech rights of American citizens across the United States in a manner that advanced the Government's preferred narrative about significant matters of public debate.

Executive Order 14149, *Restoring Freedom of Speech and Ending Federal Censorship*, 90 Fed. Reg. 8243, 8243 (Jan. 20, 2025). Plaintiff believes the Executive Order amounts to a concession by the Government that its First Amendment claim has merit. (Pl. Supp. Br. 1). NewsGuard counters that the Executive Order has no bearing on the alleged conduct, which is aimed at foreign propaganda efforts and not at the constitutionally protected speech of U.S. citizens. (NG Supp. Br. 1-2). And, for its part, the Government says it "is evaluating its position regarding the legal implications" of the Executive Order, and it urges the Court not to reach the merits. (Gov't Supp. Br. 1 & n.1).

The Court disregards the Executive Order because it gives no deference to the President's declaration that certain conduct violates the First Amendment rights of U.S. citizens.  When courts "interpret[ ] the Constitution, [they] … act[ ] within the province of the Judicial Branch, which embraces the duty to say what the law is."  *City of Boerne* v. *Flores*, 521 U.S. 507, 536 (1997) (citing *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)).  "Judges have always been expected to apply their 'judgment' *independent* of the political branches when interpreting the laws those branches enact."  *Loper Bright Enters.* v. *Raimondo*, 603 U.S. 369, 412 (2024) (citing *The Federalist No. 78* (Alexander Hamilton)).  For the reasons discussed above, in the exercise of its independent judgment, this Court concludes that the alleged conduct does not infringe on Plaintiff's First Amendment rights.

## C.    Plaintiff's Defamation Claim Against NewsGuard

As a second line of attack, Plaintiff alleges that NewsGuard's (i) characterization of Plaintiff as "anti-U.S." (SAC ¶¶ 179-182(a)) and (ii) evaluation of Plaintiff's credibility (*id.* ¶¶ 135, 160-178) are defamatory. However, the Court finds that the challenged statements are non-actionable expressions of opinion, which Plaintiff does not plausibly allege to be false. Moreover, even if the statements were otherwise actionable, Plaintiff does not sufficiently allege that NewsGuard made these statements with actual malice, as required for public figures like NewsGuard.

1.    **The Law of Defamation**

"'Defamation' includes the torts of libel (usually written) and slander (usually oral)." *Best Van Lines, Inc.* v. *Walker*, 490 F.3d 239, 245 n.7 (2d Cir. 2007). "Under New York law, to establish a claim for defamation, a plaintiff must plead '[i] a defamatory statement of fact; [ii] that is false; [iii] published to a third party; [iv] "of and concerning" the plaintiff; [v] made with the applicable level of fault on the part of the speaker; [vi] either causing special harm or constituting slander per se; and [vii] not protected by privilege.'" *Cummings* v. *City of New York*, No. 19 Civ. 7723 (CM) (OTW), 2020 WL 882335, at *15 (S.D.N.Y. Feb. 24, 2020) (quoting *Frascatore* v. *Blake*, 344 F. Supp. 3d 481, 493 (S.D.N.Y. 2018) (quoting *FTA Mkt. Inc.* v. *Vevi, Inc.*, No. 11 Civ. 4789 (VB), 2012 WL 383945, at *6 (S.D.N.Y. Feb. 1, 2012))), *aff'd*, No. 21-1380, 2022 WL 2166585 (2d Cir. June 16, 2022) (summary order); *see also Palin* v. *N.Y. Times Co.*, 940 F.3d 804, 809-10 (2d Cir. 2019) (delineating these as five elements). Additionally, plaintiffs who are public figures must show that the defamatory statement was made with actual malice, defined as "knowledge that it was false or with reckless disregard of whether it was false or not." *Palin*, 940 F.3d at 809 (internal quotation marks omitted) (quoting *Church of Scientology Int'l* v. *Behar*, 238 F.3d 168, 173-74 (2d Cir. 2001) (quoting *N.Y. Times Co.* v. *Sullivan*, 376 U.S. 254, 280 (1964))). "Because a defamation suit may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage." *Cummings*, 2020 WL 882335, at *15 (quoting *Adelson* v. *Harris*, 973 F.

41

Supp. 2d 467, 481 (S.D.N.Y. 2013) (internal quotation marks omitted), *aff'd*,

876 F.3d 413 (2d Cir. 2017) (per curiam)).

### 2.    The Court Dismisses Plaintiff's Defamation Claim Against NewsGuard Under Rule 12(b)(6)

The Court dismisses Plaintiff's defamation claim pursuant to Rule

12(b)(6) for three independent reasons: (i) the allegedly defamatory statements

are non-actionable expressions of opinion; (ii) Plaintiff does not plausibly allege

that the statements are false; and (iii) Plaintiff does not plausibly allege that

NewsGuard made the statements with actual malice.

### a.    The Allegedly Defamatory Statements Are Protected Opinion

"Expressions of opinion, as opposed to assertions of fact, are deemed

privileged and, no matter how offensive, cannot be the subject of an action for

defamation." *Mann* v. *Abel*, 10 N.Y.3d 271, 276 (2008) (citations omitted); *see

also Frascatore*, 344 F. Supp. 3d at 494 ("[S]tatements that do not purport to

convey *facts* about the plaintiff, but rather express certain kinds of *opinions* of

the speaker, do not constitute defamation." (quoting *Elias* v. *Rolling Stone LLC*,

872 F.3d 97, 110 (2d Cir. 2017))).  "Whether a statement constitutes a

protected opinion or actionable fact depends on 'the content of the

communication as a whole, its tone and apparent purpose.'"  *Dfinity Found.* v.

*N.Y. Times Co.*, 702 F. Supp. 3d 167, 174 (S.D.N.Y. 2023) (quoting *MiMedx

Grp., Inc.* v. *Sparrow Fund Mgmt. LP*, No. 17 Civ. 7568 (PGG) (KHP), 2018 WL

847014, at *6 (S.D.N.Y. Jan. 12, 2018) (citing *Immuno AG* v. *Moor-Jankowski*,

77 N.Y.2d 235 (1991)), *report and recommendation adopted*, No. 17 Civ. 7568

(PGG), 2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018)), *aff'd*, No. 23-7838, 2024

WL 3565762 (2d Cir. July 29, 2024) (summary order).

　　　The New York Court of Appeals has set forth four factors to help courts

sort protected opinions from actionable facts:

> [i] an assessment of whether the specific language in
> issue has a precise meaning which is readily
> understood or whether it is indefinite and ambiguous;
> [ii] a determination of whether the statement is capable
> of being objectively characterized as true or false; [iii] an
> examination of the full context of the communication in
> which the statement appears; and [iv] a consideration
> of the broader social context or setting surrounding the
> communication including the existence of any
> applicable customs or conventions which might signal
> to readers or listeners that what is being read or heard
> is likely to be opinion, not fact.

*Celle* v. *Filipino Rep. Enters.*, 209 F.3d 163, 178-79 (2d Cir. 2000) (internal

quotation marks omitted) (quoting *Steinhilber* v. *Alphonse*, 68 N.Y.2d 283, 292

(1986) (internal quotation marks omitted)).  The plaintiff bears the burden of

"establish[ing] that in the context of the entire communication a disputed

statement is not protected opinion." *Id.* at 179.  "Whether a statement is a fact

or opinion is a question of law … appropriately raised at the motion to dismiss

stage." *Dfinity Found.*, 702 F. Supp. 3d at 174 (internal quotation marks

omitted and alteration adopted).

　　　"In conducting its analysis, the Court 'recognize[s] and utilize[s] the

important distinction between a statement of opinion that *implies a basis in*

*facts which are not disclosed* to the reader or listener and a statement of

opinion that is *accompanied by a recitation of the facts on which it is based* or

one that does not imply the existence of undisclosed underlying facts."

*Frascatore*, 344 F. Supp. 3d at 494 (alterations in original) (emphases added) (quoting *Elias*, 872 F.3d at 111 (quoting *Celle*, 209 F.3d at 178)).  The former is actionable because a reasonable reader would infer that the writer knows certain facts, unknown to the audience, that support the opinion and are detrimental to the person toward whom the communication is directed; the latter is not actionable because a statement of opinion offered after a recitation of the facts on which it is based is likely to be understood by the audience as conjecture.  *See Gross* v. *N.Y. Times Co.*, 82 N.Y.2d 146, 152-54 (1993).

Plaintiff alleges that NewsGuard defamed it by labeling its publication "anti-U.S.," thus "malign[ing] the loyalty and patriotism of [Plaintiff's] staff." (SAC ¶¶ 179-182(a)).  This allegation derives from a statement in NewsGuard's Nutrition Label, which states that *Consortium News* is "[a] website that covers international politics from a *left-wing, anti-U.S. perspective* that has published false claims about the Ukraine-Russia war and other international conflicts." (*Id.* ¶ 51 (emphasis added) (quoting *id.*, Ex. A)).  The "anti-U.S. perspective" label, however, is a protected expression of NewsGuard's opinion.  After all, "anti-U.S." does not have a precise, readily understood meaning and is not capable of being objectively characterized as true or false.  *See Celle*, 209 F.3d at 178-79.  One need look no further than the Second Amended Complaint, wherein Plaintiff says that "criticiz[ing] American policy does not render a writer or a news organization 'anti-U.S.' but is the highest form of citizenship." (SAC ¶ 180).  That is, Plaintiff takes "anti-U.S." to mean critical of (but not unilaterally opposed to) U.S. policy, and a reasonable reader might agree.  A

44

different, but equally reasonable, reader could take it to mean that Plaintiff is aiming to undermine the U.S. in some way, or that Plaintiff is opposed to the current U.S. government.  The term has a "debatable, loose[,] and varying" meaning in contemporary political discourse, like the terms "fellow traveler," "fascis[t]," and "radical right."  *Buckley* v. *Littell*, 539 F.2d 882, 894 (2d Cir. 1976), *cert. denied*, 429 U.S. 1062 (1977).

The similar phrase "anti-American" was previously found to be the protected "opinion of a person 'voicing no more than a highly partisan point of view.'"  *Egiazaryan* v. *Zalmayev*, 880 F. Supp. 2d 494, 507 (S.D.N.Y. 2012) (quoting *Immuno AG.*, 77 N.Y.2d at 255).  As such, "anti-U.S." cannot be objectively characterized as true or false.  The phrase is, essentially, a tamed form of political invective, akin to (but not as inflammatory as) other terms that have been found to be protected opinion, such as "xenophobic," *Ganske* v. *Mensch*, 480 F. Supp. 3d 542, 553-54 (S.D.N.Y. 2020), and "racist," *Ratajack* v. *Brewster Fire Dep't Inc. of Brewster-Se. Joint Fire Dist.*, 178 F. Supp. 3d 118, 165-66 (S.D.N.Y. 2016).[10]  It is an instance of "loose language or undefined

---

[10]    The Court also rejects Plaintiff's argument, based on *Westmoreland* v. *CBS, Inc.*, 596 F. Supp. 1170 (S.D.N.Y. 1984), that pairing "anti-U.S." — a phrase that, Plaintiff concedes, "standing alone … would likely be a statement of opinion" (Pl. NG Opp. 24) — with statements that Plaintiff publishes false claims and fails to regularly correct errors, transmutes a protected opinion into a statement that is actionable as defamation.  The comparison to *Westmoreland* is inapt.  In *Westmoreland*, the statement that General Westmoreland engaged in a "conspiracy" was paired with accusations that the General had ordered "his officers to draw dishonest conclusions and give false reports."  596 F. Supp. at 1172.  The attendant "factual" allegations here do not transform the phrase "anti-U.S." into an actionable one.  And for reasons discussed in this subsection, NewsGuard's statements regarding Plaintiff's publication of false claims and failure to regularly correct errors form part of NewsGuard's Nutrition Labels, which is a subjective rating system that constitutes protected opinion.

slogans that are part of the conventional give-and-take in our economic and political controversies." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO* v. *Austin*, 418 U.S. 264, 284 (1974) (quoting *Cafeteria Emps. Loc. 302* v. *Angelos*, 320 U.S. 293, 295 (1943)).

Plaintiff also alleges that NewsGuard defamed it by labeling its website untrustworthy. Specifically, NewsGuard placed a "red 'X' in its 'Nutrition' label next to the journalistic standard marked 'Regularly corrects or clarifies errors.'" (SAC ¶ 161 & Ex. A). This is one of the nine "journalistic practice" criteria on which NewsGuard bases its rating of a news organization's trustworthiness, reliability, and ethics. (*Id.* ¶ 32). The Court finds that, in the context of its rating system, NewsGuard's rating of Plaintiff's error-correction practice is protected opinion.

NewsGuard says that its rating system is the product of "human judgment [exercised] to assess a site's performance on each of the nine criteria." (SAC, Ex. B at 7). In other words, NewsGuard discloses that it "chooses the inputs for its [rating] system and decides how to weigh them" and, therefore, its rating system is an "inherently subjective" protected "statement[ ] of opinion." *Davis* v. *Avvo, Inc.*, 345 F. Supp. 3d 534, 541 (S.D.N.Y. 2018). The rating system is akin to "restaurant ratings and reviews[, which] almost invariably constitute expressions of opinion." *Themed Rests., Inc.* v. *Zagat Survey, LLC*, 802 N.Y.S.2d 38, 40 (1st Dep't 2005) (citing *Mr. Chow of N.Y.* v. *Ste. Jour Azur S.A.*, 759 F.2d 219, 227-28 (2d Cir. 1985) ("[Restaurant reviews] are to a large extent controlled by personal tastes. The average reader

46

approaches a review with the knowledge that it contains only one person's views of the establishment.")).  Indeed, Plaintiff acknowledges that "reasonable people (and news organizations) have reached a divergent set of views as to" the very topics underlying NewsGuard's rating, including "the widespread influence of neo-Nazis in Ukraine."  (SAC ¶ 105; *see also id.* ¶¶ 82 ("reasonable interpretation"), 98 ("a matter of interpretation"), 115 ("reasonable inference")).  Inasmuch as NewsGuard's statement about Plaintiff's tendency to correct errors forms part of its nine-criteria rating system, it is protected opinion.

Furthermore, NewsGuard's full disclosure of the facts underlying these statements demonstrates that, in context, both categories of allegedly defamatory statements are protected opinion.  Recall that a statement accompanied by a recitation of the facts on which it is based is not actionable because it is likely to be understood by the audience as conjecture.  *See Frascatore*, 344 F. Supp. 3d at 494; *Gross*, 82 N.Y.2d at 152-54.  Here, NewsGuard fully discloses the facts that form the basis of its allegedly defamatory statements.  In fact, in the "Content" section of its Nutrition Label for *Consortium News*, NewsGuard details the factual basis for its belief that certain claims in Plaintiff's articles are "false and misleading."  (SAC, Ex. N at 3-8).  Likewise, NewsGuard explains the factual basis for its "anti-U.S. perspective" description, namely, that Plaintiff's "commentary is frequently critical of the foreign policy of the U.S. and other Western countries, often describing them as 'imperialistic,'" including one article that described the United States as "the most tyrannical and murderous regime on earth, by a

truly massive margin," and another stating that the U.S. government "act[ed] foolishly and against [its] best interest" in Ukraine.  (*Id.* at 2-3).  A user of Plaintiff's website who subscribes to NewsGuard's service can access this detailed explanation simply by hovering over the NewsGuard rating and clicking "SEE THE FULL NUTRITION LABEL."  (*Id.*, Ex. L; *see also* NG Reply 7-8).

The link in the Nutrition Label is factually indistinguishable from "the inclusion of a hyperlink to a report or article in a communication shared on an Internet forum[, which] is a sufficient means of disclosing a factual basis on which an opinion rests.  *Ganske*, 480 F. Supp. 3d at 554 (citing *Adelson*, 973 F. Supp. 2d at 484-85 ("The hyperlink is the twenty-first century equivalent of the footnote for purposes of attribution in defamation law[.]"); *Mirage Ent., Inc.* v. *FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 38 (S.D.N.Y. 2018) (finding statement not actionable as defamation where defendant linked to an article providing the basis for her opinion)).  Because NewsGuard hyperlinks to the detailed factual basis for its rating, a reasonable reader is likely to understand NewsGuard's trustworthiness rating to be non-actionable opinion.[11]

---

[11]    The Court rejects Plaintiff's argument that NewsGuard's hyperlinking to the detailed factual basis for its opinion in fact supports the opposite conclusion.  (Pl. NG Opp. 29).  Plaintiff cites *Gross* v. *N.Y. Times*, 82 N.Y.2d 146, 155-56 (1993), for the proposition that the imprimatur of fact inherent in detailed news articles mitigates against a finding of opinion.  That might be true in the context of the news section of a newspaper, where an allegation of "corrupt[ion]" was published in *Gross*; however, it is not the case in the context of NewsGuard's subjective news rating system, which is more like a newspaper's editorial section.  *Cf. id.* at 156.

### b.    Plaintiff Does Not Plausibly Allege That the Challenged Statements Are False

In the alternative, NewsGuard argues that if its statements are not protected opinion, Plaintiff nevertheless fails to plausibly allege that the allegedly defamatory statements are false.  (NG Br. 20).  Falsity is an element of any defamation claim.  *See Cummings*, 2020 WL 882335, at *15.  "Despite truth often being framed as a defense to [defamation], the burden of proving the falsity of a statement rests with the plaintiff."  *Leidig* v. *BuzzFeed, Inc.*, 371 F. Supp. 3d 134, 143 (S.D.N.Y. 2019), *aff'd*, 788 F. App'x 76 (2d Cir. 2019) (summary order).  "Where the substance, the gist, or the sting of a statement is true, it cannot be [defamatory]."  *Id.* (alterations adopted) (internal quotation marks omitted).  Plaintiff does not plausibly allege that the anti-U.S. label, or NewsGuard's statement that it publishes false content, is false.  Thus, Plaintiff fails to establish an element of its defamation claim.

As for the "anti-U.S. perspective" phrase, Plaintiff does not appear to contest NewsGuard's argument that the phrase is not false.  (*See generally* Pl. NG Opp.).  Nor should it.  In the Second Amended Complaint, Plaintiff proudly acknowledges that it "criticize[s] American policy" (SAC ¶ 180), and that it holds "views that differ or dissent from policies of the United States and its allies" (*id.* ¶ 24; *see also id.* ¶¶ 47, 65, 83(a), 91(a), 106(a), 117(a), 135(a), 142, 151-152, 155).  No doubt, the "gist" of the "anti-U.S. perspective" phrase is true.  *Leidig*, 371 F. Supp. 3d at 143.  Consequently, Plaintiff does not adequately plead that the "anti-U.S. perspective" statement is false.

49

As for the statements that *Consortium News* publishes false information, here, too, Plaintiff does not plausibly allege that these statements are false. It is true that, in the Second Amended Complaint, Plaintiff contests NewsGuard's assessment of some *Consortium News* articles. (*See* Pl. NG Opp. 22). For example, NewsGuard reporter Zachary Fishman identified as "false" the statement in a *Consortium News* article that "Washington organized a coup against a democratically elected government" in Ukraine. (SAC ¶ 74 (citing *id.*, Ex. C at 3)). In an email exchange with *Consortium News* editor-in-chief Joe Lauria, Fishman explained his belief that, to the contrary, Ukraine's 2014 revolution "ha[d] the markings of a popular uprising." (*Id.*, Ex. C at 3). Plaintiff claims that the belief that Washington organized a coup in Ukraine "reflect[s] a widely held view of the U.S. role in the 2014 coup in Ukraine" and cites a BBC report about a leaked phone call between two top U.S. diplomats, as well as some other articles, in support of this view. (*Id.* ¶¶ 76-81).

Plaintiff does not allege that its position is true and NewsGuard's is false. Rather, Plaintiff concedes that its position is but one perspective. With respect to the coup statement, Plaintiff claims that the other news organizations' articles demonstrate that *Consortium News*'s "commentary that the U.S. had 'organized' a coup is *derived from a reasonable interpretation* of known facts and of recent history," and, therefore, should not have been labeled false. (SAC ¶ 82 (emphasis added)). Likewise, Plaintiff claims that its writers' view of the influence of neo-Nazis in Ukraine is "a matter of interpretation and inference … shared by other reputable news organizations" (*id.* ¶ 98), and that its view that

50

a 2018 bombing in Syria was a "false flag incident" is one that "other media organizations have also expressed" and that "arises out of a reasonable inference" (*id.* ¶¶ 107-109, 115). (*See also id.* ¶¶ 86 ("an analysis shared by reputable writers and organizations"), 134 ("a statement derived from known facts and shared by others in the public realm")). In sum, rather than alleging that NewsGuard's statements are false, Plaintiff alleges that its statements are matters of interpretation and influence that *might* be true, which is plainly insufficient to state a defamation claim.

### c.    Plaintiff Does Not Plausibly Allege Actual Malice

A third basis for dismissal of Plaintiff's defamation claim arises from Plaintiff's failure to plausibly allege that NewsGuard made the allegedly defamatory statements with actual malice. To recap, when alleging defamation, plaintiffs who are public figures must show that the defamatory statement was made with actual malice, *i.e.*, knowledge that it was false or reckless disregard as to whether it was false. *See Palin*, 940 F.3d at 809. "Those who have voluntarily sought and attained influence or prominence in matters of social concern are generally considered public figures." *Celle*, 209 F.3d at 176 (citing *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 345 (1974)). Plaintiff does not contest its status as a public figure (*see* Pl. NG Opp. 18), and thus it must plead and prove actual malice by "clear and convincing evidence," which is a "heavy burden." *Contemp. Mission, Inc.* v. *N.Y. Times Co.*, 842 F.2d 612, 621 (2d Cir. 1988) (internal quotation marks omitted); *see also Biro* v. *Condé Nast*, 807 F.3d 541, 546 (2d Cir. 2015) ("[A] public-figure plaintiff must

plead plausible grounds to infer actual malice by alleging enough facts to raise a reasonable expectation that discovery will reveal evidence of actual malice." (internal quotation marks omitted and alteration adopted)).

The principal evidentiary support for Plaintiff's actual malice claim is an email exchange between NewsGuard's Fishman and *Consortium News*'s Lauria, in which Fishman acknowledged that *Consortium News* "has a regular pattern of issuing corrections."  (SAC ¶¶ 162-164 (quoting *id.*, Ex. C at 7)).  Fishman based this on the fact that he "found additional corrected articles from the past year since [he] first asked [Lauria] for additional examples."  (*Id.*, Ex. C at 7). Fishman went on to say: "However, many articles that have included claims I previously identified as false … have not been corrected[.] … Given that many recent false claims have gone uncorrected, do you [Lauria] believe Consortium News'[s] correction practices are effective?"  (*Id.*).

The Court quotes at length from Fishman's email exchange with Lauria because Plaintiff contends that Fishman's acknowledgement of Plaintiff's "regular pattern of issuing corrections" actually establishes knowledge of (or reckless disregard for) the falsity of NewsGuard's "indicating to subscribers that [Plaintiff] does not regularly correct or clarify errors."  (SAC ¶¶ 164-165). Not so.  Fishman's email, read in context, does not "permit the conclusion that [NewsGuard] in fact entertained serious doubts as to the truth of [its] publication," as NewsGuard must have in order for Plaintiff to show actual malice.  *Church of Scientology*, 238 F.3d at 174 (internal quotation marks omitted).  True, Fishman (and therefore NewsGuard) acknowledged that

Plaintiff had a regular pattern (whether modest or robust, Fishman did not say) of issuing corrections. But Fishman's acknowledgment of this fact does not contradict another, independent fact: that Plaintiff failed to correct many of the articles Fishman identified. As alleged, both things can be true. Plaintiff has not established that NewsGuard doubted the veracity of its claim that *Consortium News* left false claims uncorrected. Thus, Plaintiff cannot meet its heavy burden to show actual malice by means of NewsGuard's acknowledgement that Plaintiff has a pattern of issuing corrections.[12]

Plaintiff's attempt to show actual malice by means of NewsGuard's rating the trustworthiness of the entire *Consortium News* website, rather than individual articles or videos, also fails. According to Plaintiff, such broad-brush labeling demonstrates reckless disregard for whether NewsGuard's warning label was false. (*See* Pl. NG Opp. 20-21; SAC ¶ 57). However, Plaintiff misapprehends the actual malice standard. "'[M]ere proof of failure to investigate, without more' does not establish actual malice." *Dongguk Univ.* v. *Yale Univ.*, 734 F.3d 113, 125-26 (2d Cir. 2013) (quoting *Gertz*, 418 U.S. at 332). Likewise, a failure to discover a misstatement, or a failure to review one's own files, might suffice to demonstrate negligence, but not actual malice. *Id.* at 126. Plaintiff's argument sounds in negligence. To accept this theory would be

---

12    For these reasons, *Project Veritas* v. *Cable News Network, Inc.*, 121 F.4th 1267 (11th Cir. 2024), which Plaintiff raises in its supplemental brief (*see* Pl. Supp. Br. 2), is inapposite. The Eleventh Circuit in *Project Veritas* found that CNN was aware that its reporter's statements were probably false. 121 F.4th at 1283. Here, Plaintiff does not plausibly allege that NewsGuard knew its claim was false (based on its reporter's claim that NewsGuard has a regular pattern of issuing corrections). As alleged, NewsGuard knew both statements to be true.

akin to finding actual malice on the part of a restaurant critic who, without trying every dish on a restaurant's menu, gives the restaurant a negative review based on a few bad meals.  Actual malice is a subjective standard, *see Church of Scientology*, 238 F.3d at 174, which is not measured by what the defendant could have thought or known, but what the defendant actually thought or knew, *see, e.g.*, *Prince* v. *Intercept*, 634 F. Supp. 3d 114, 140 (S.D.N.Y. 2022) (finding no actual malice where "[d]efendants substantiated *some* of the[ir] claims" (emphasis added)).

Finally, Plaintiff argues that NewsGuard acted with actual malice because it stated that Plaintiff published false content on its website before speaking with Plaintiff, identifying which articles were false, or giving Plaintiff an opportunity to respond.  (SAC ¶ 72).  However, even if Plaintiff had denied that it was "anti-U.S." and "published false claims," and NewsGuard went ahead and published the claims, this would be insufficient.  *See Edwards* v. *Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977) (observing that actual malice "cannot be predicated on mere denials, however vehement").

## CONCLUSION

For the above reasons, the Government's motion to dismiss and NewsGuard's motion to dismiss are both GRANTED in their entirety. The Court dismisses the Second Amended Complaint with prejudice.[13] The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:    March 26, 2025
          New York, New York

_____
          KATHERINE POLK FAILLA
          United States District Judge

---

[13] Plaintiff has twice amended its complaint and has not sought leave to amend a third time. Given the analysis above, the Court does not believe that further amendment would remedy the jurisdictional, procedural, and pleading deficiencies outlined in this Opinion. *See Baines* v. *Nature's Bounty (NY), Inc.*, No. 23-710, 2023 WL 8538172, at *3 (2d Cir. Dec. 11, 2023) (summary order) (finding no abuse of discretion in denying leave to amend where plaintiffs had "already amended their complaint once in the face of a pre-motion letter from Defendants," and then "requested leave to amend again in a single, boilerplate sentence without specifying what allegations they could add or how amendment would cure any deficiencies"); *Binn* v. *Bernstein*, No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4550312, at *34 (S.D.N.Y. July 13, 2020) ("To grant Plaintiffs leave to amend would be allowing them a 'third bite at the apple,' which courts in this district routinely deny." (collecting cases)), *report and recommendation adopted*, No. 19 Civ. 6122 (GHW), 2020 WL 4547167 (S.D.N.Y. Aug. 6, 2020); *Gorman* v. *Covidien Sales, LLC*, No. 13 Civ. 6486 (KPF), 2014 WL 7404071, at *2 (S.D.N.Y. Dec. 31, 2014) (noting that "it remains 'proper to deny leave to replead where ... amendment would be futile'" (quoting *Hunt* v. *Alliance N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 728 (2d Cir. 1998))); *cf. Nat'l Credit Union Admin. Bd.* v. *U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim." (internal quotation marks omitted)).